## BOHL v. CARSON.[1]

(Circuit Court of Appeals, Sixth Circuit. May 28, 1894.)

### No. 126.

1. NOTE—CONSIDERATION—EVIDENCE.

On an issue as to whether a note for $8,000 executed by C. to his own order, indorsed by him in blank, and held by a bank, was for a consideration, or, as claimed by him, was an accommodation for the bank, C. testified that having money in the bank, drawing no interest, A., the cashier, said "I" or "we" (by which C. said he understood reference was made to the bank) "can use" it, and that a loan of $8,000 was made accordingly; that, on his asking repayment, A. told him to draw on the bank, which he did June 26th; that, three days later, A. asked him to execute an accommodation note of $8,000 for the bank, antedated June 26th, which he did, the note in question being the last of the renewals of it. It was not claimed, however, that he thought the bank was using his name to borrow money. A., who was discredited as a witness by reason of misappropriation of the bank's money, testified that C. made his loan expressly to him and S., partners in a coal-land speculation, and that when C. demanded repayment he said he had not the money, but could procure it for C. from the bank on C.'s note, he agreeing that he and S. would take care of it, and pay the interest on it, and that accordingly, on June 26th, C. executed the note for $8,000, and A., as cashier, discounted it, and placed the proceeds to the account of C. A. used in the coal-land speculation the $8,000 loaned by C., and at the same time exe-

cuted the note of himself and S. to C., and placed it in an envelope in the bank vault, where C. kept his private papers. A. testified that C. knew of it at the time. C. denied any knowledge of it till two years later. C. knew of the speculation of A. and S., and S. testified that, a few days after the loan, C. asked him how it was coming on, and remarked to him that they were using $8,000 of his, C.'s, money in the enterprise. C.'s pass book showed a charge to his account at that time, "Note $8,000." C. produced the bank's vouchers for every other charge against him, covering a period of several years, except this one. Where the word "note" was used in other charges, the voucher was a check drawn as a loan on a note. Not only did C.'s pass book show a discount by the bank of his note for $8,000 on June 26th, but the bank's books showed such an entry between entries of the same date made by clerks whose integrity was not questioned. A. also placed in C.'s private envelope in the bank, as collateral security for the note of himself and S., notes secured by mortgage on the coal land. C. denied knowledge of their existence. C. was slipshod in business, his pass book lay at the bank nearly all the time, and it was claimed that he was a child in A.'s hands. *Held,* that the evidence sustained the statement of A., and showed that the note was for a consideration.

2. BANKS—SPECIAL DEPOSIT—FAILURE TO PROTEST.

Where a cashier of a bank places his indorsed note in the private envelope of a depositor, in the vault of the bank, as collateral security for his individual note to the depositor, the bank is not liable for release of the indorser by failure to present the note for payment, and to notify the indorser of nonpayment; the note being merely a special deposit with the bank, and constructively in the depositor's possession.

3. SAME—ESTOPPEL—OPINION OF OFFICERS.

The fact that the officers of a bank whose cashier had recently absconded, believing the statement of one whose note it held that it was merely a note given at the cashier's request for the accommodation of the bank, expressed an opinion to C. that the note was without consideration, will not estop the bank from showing that there was a consideration, and enforcing the note.

4. SAME—USE OF COLLATERAL.

Nor is the bank estopped from enforcing the note by reason of the fact that on the statement of C. that the note was without consideration, and that he had no interest in a mortgage in his private envelope in the bank's vault, executed by the cashier, and purporting to be collateral security to a note of the cashier to C., the bank assumed ownership over it, though, on its being shown that it was C.'s property, he is entitled to a credit for the amount realized by the bank from it.

5. SAME—CREDITS.

Where a bank cashier sent money of his to C., to be applied on his note to C., and C., claiming that neither the cashier owed him, nor he the bank, turned the money over to the bank, he should, on its being shown that he owed the bank and the cashier owed him, be allowed credit on his debt to the bank for the amount, with interest from its receipt by the bank.

Appeal from District Court for the Southern District of Ohio.

Action by Henry Bohl, agent of the Second National Bank of Xenia, Ohio, against James Carson, on a note. Decree for defendant. Plaintiff appeals. Reversed.

Henry Bohl, as receiver of the Second National Bank of Xenia, Ohio, brought an action against James Carson on a promissory note dated March 17, 1884, for $8,000, payable four months after date, made by Carson to his own order, and indorsed by him in blank. Pending the action the debts of the bank were paid. Bohl was discharged as receiver, and was duly appointed by the stockholders of the bank as agent, in pursuance of the national banking act, and the action was proceeded with in the name of Henry Bohl, as agent. Carson filed an ancillary bill on the equity side of the district court, seeking to enjoin Bohl from further proceeding in his action at law, on the

ground that he had an equitable defense to the note, which could not be set up in an action at law. The defenses which he set up in the bill to the note were: First, that the note was given to the bank as a mere accommodation to the bank, and not for any consideration; second, that, even if there was a consideration for the note, the bank had had in its possession, as collateral for its payment, notes for $13,000, with a solvent indorser, whom it had released from liability through negligence in presentment, protest, and notice; and, third, that the bank and its successors in title were estopped by matter in pais from seeking to hold the plaintiff, in any way, liable on the note. The district court found the equities with Carson, and entered a decree perpetually enjoining Bohl, as agent of the bank, from further prosecution of his action at law on the note. This is an appeal by Bohl from that decree.

John S. Ankeney was in 1882, and had been since 1864, cashier and chief executive officer of the Second National Bank of Xenia. In 1880 he and one W. M. Smart, partners as Smart & Ankeney, purchased a tract of coal land in Hocking county, Ohio, for about $16,000. Neither partner had any capital, but Ankeney assumed the task of raising it. He secured enough for the first payment of $8,000, by indorsing the firm note with his signature as cashier of his bank, and, on the faith of the credit of his bank, procured its discount by the Farmers' & Traders' Bank at Jamestown, Ohio. The second payment came due in January, 1882, and he obtained the money for it from J. H. Cooper, county treasurer. Whether this was on his own credit, or on that of the bank, is disputed. Cooper called for repayment in February, 1882, and Ankeney was obliged to secure the money elsewhere. Carson, the complainant and appellee, had long been a depositor at the Second National Bank, and intimate with its officers. Much to his disappointment, the maker of a note held by him for $8,500 had paid it to the bank. This increased his deposit account early in February, 1882, to about $11,000. He complained to Ankeney that the payment of the note prevented its earning the interest he had expected. Ankeney said that he or they could use the money for a few days. Carson replied that this would be satisfactory, if he could have the money when he wished it, because he expected to use the money, later on, to purchase a business. A loan was accordingly made. Carson says that he understood Ankeney, in this conversation, to be speaking for the bank, as its cashier, and that he lent the money, not to Ankeney, but to the bank. Ankeney swears that the loan was made expressly to himself and Smart, to assist them in their coal-land speculation, and that he offered to Carson, as security for the loan, some coal-land securities to be thereafter given him, which offer Carson accepted. Carson says he knew that Smart & Ankeney were engaged in a coal-land speculation, and admits that Ankeney said something about coal-land securities as collateral to the loan, which he declined, because he was entirely content with the obligation of the bank. He says he supposed that the bank was helping Smart & Ankeney in the coal-land investment. Ankeney used $8,000 of Carson's deposit to repay Cooper.

It is admitted that at the time Ankeney used this $8,000 he executed a note of Smart & Ankeney for that amount, payable to himself, and by him indorsed to the order of James Carson, and placed this note in an envelope in the vault of the bank, where Carson kept his private papers. Carson denies that he had any knowledge of the existence of this note until two years or more later, after Ankeney had resigned as cashier and had gone west. Ankeney says that Carson did know of the note when it was executed. Smart (Ankeney's partner), who was called as a witness for Carson, says that this note was always referred to by himself and Ankeney as the "Carson note." He also says that Carson met him on the street shortly after its execution, and asked him how the Smart & Ankeney coal-land investment was getting' on, remarking that they were using $8,000 of his money in the enterprise. This Carson does not deny. Carson was a slipshod business man, and left everything with Ankeney and the bank. His bank pass book lay at the bank almost all the time. The entries in it, covering the period from 1882 to 1884, are nearly all of them in Ankeney's handwriting. At the date of February 6, 1882, appears this debit to Carson's account, "Note $8,000.00." Carson produces all the bank's vouchers for charges against him in the pass book, except the one corresponding with this entry. For a

similar entry of January 6, 1882, as follows: "Jan. 6. Note T. P. T. $1,060.00."—the voucher proves to be a check of Carson to the order of Townsley, the president of the bank, as a loan on Townsley's note. In June, 1882, Carson wished a return of the $8,000 lent by him in the previous February. He says that he applied to Ankeney for it, and Ankeney told him that all he had to do was to draw his check on the bank for the amount. Accordingly, on June 26th, he did draw his check for $10,000, and it was paid. Ankeney's statement is that Carson applied to him for a repayment of the loan of $8,000, and was told by him that he did not have the money; that, upon Carson's pressing him, he said he could procure the money from the bank for Carson by discounting the latter's note for that amount; that Carson thereupon, on June 26th, made a note for $8,000, payable to himself, and indorsed in blank, which Ankeney, as cashier, discounted, placing the proceeds to Carson's credit on the books of the bank; that he told Carson that he and Smart would take care of the note, and pay the interest on it. Carson's statement is that, some three days after he had drawn his check of June 26th, Ankeney asked him, as an accommodation to the bank, to give his note for $8,000, and date it back to June 26th, which he did; that from time to time he gave renewals of this note to the bank, at Ankeney's request, without any consideration, the last being the note in suit; that when the note in suit fell due, in July, 1884, he declined to renew it further, although Ankeney offered him $1,800 in cash to do so. The books of the bank and Carson's pass book contain entries dated June 26, 1882, showing a discount by the bank of Carson's note for $8,000, and the payment of $10,000 on his check. The entry of the discount of Carson's note first appears on the daily blotter of June 26, 1882, in Ankeney's handwriting. The entry is preceded and followed by other entries of the same date, in the handwriting of clerks of the bank, whose integrity is not questioned. The entry was transferred to the journal for that date, at the end of the day's business, by one of these same clerks. In July, Carson's note fell due, and it was renewed, Smart & Ankeney paying the interest. On July 31, 1882, Smart & Ankeney executed a mortgage on their coal lands to Samuel W. Smart, a brother of W. M. Smart, Ankeney's partner, to secure notes aggregating $18,000 in amount, payable to Samuel W. Smart in two years from date. One of these notes, for $5,000, indorsed in blank by Samuel W. Smart, was given to one King, to whom Smart & Ankeney were indebted in that sum. The remaining notes, for $13,000 in all, were similarly indorsed, and were placed by Ankeney in Carson's private envelope in the bank, in pursuance, as Ankeney says, of his promise to Carson to give coal-land securities as collateral for the Smart & Ankeney note for $8,000 executed February 6th. Carson denies any knowledge of these notes, and repudiates ownership of them. They remained in Carson's envelope in the bank until they fell due, early in August, 1884. They were not presented for payment or protested, so that Samuel W. Smart, the indorser, was released from liability, if, indeed, he could otherwise have been held. In July, 1884, Smart & Ankeney's coal property ceased to produce coal, and they abandoned their enterprise, selling their equipment and plant. From this, after the payment of certain debts, they realized about $1,800. Ankeney's misuse of the funds and credit of the bank becoming suspected, his resignation followed, and he left Xenia for the west. After his departure the affairs of the bank were found to be in bad condition. His use of the credit of the bank to borrow $8,000 from the Jamestown bank was discovered, and other irregularities. Before Ankeney left Xenia, he took the $1,800 left from the proceeds of the coal equipment and plant to his partner, W. M. Smart, and, as he says, told Smart to take it to Carson, to apply on Carson's note to the bank. Smart says Ankeney told him to take the money to Carson, to be used in case the bank ever troubled Carson on his note. When Smart took the money to Carson, Carson said it was not his, and that he would not take it; that his $8,000 note held by the bank was mere accommodation, without consideration; and that he would have nothing to do with Smart & Ankeney's property. The $1,800 was accordingly turned over to the bank by Carson, who at the time emphatically disclaimed any interest in the Smart & Ankeney note, which was indorsed to his order, and was found in his bank envelope. Carson had several interviews with the president and the new cashier of the bank at the office of an attorney,

who expressed the opinion, after hearing Carson's statement, that the note was not worth the paper it was written on. W. M. Smart, of Smart & Ankeney, who had taken no part in and had no knowledge of the fiscal transactions of the firm, expressed his opinion to the officers of the bank that Carson's note was a mere accommodation note, without consideration. This opinion was based wholly on Carson's statement to him. The bank officers expressed a wish not to hold Carson if the note was merely an accommodation, and made known their belief in Carson's version of the facts; but, though several times requested by him to do so, they declined to return to him his note until, as they expressed it, they had adjusted the affairs of the bank. The board of directors of the bank never authorized their officers to deliver up the note or to release it. Upon Carson's refusal to take them as his, the bank assumed the ownership of the mortgage notes and the Smart & Ankeney note for $8,000, in order to protect itself against loss by Ankeney. In consideration of the assignment to it of the $5,000 mortgage note which W. M. Smart procured from King and transferred to the bank, the bank released W. M. Smart from further liability on the Smart & Ankeney note, and then proceeded to foreclose the whole $18,000 mortgage on the coal lands. A small rent has been received by the bank from the coal lands down to the time of this suit. In his amended answer the defendant below averred that the course of the bank in respect of the mortgage notes and the rents from the coal lands was taken through ignorance that Carson owned the notes, and offered to credit the value of the same on the note in suit, or to do equity in any other way that might be deemed just. The Carson note remained in the bank from 1884 until 1888, when the receiver was appointed. He found the note in an envelope marked "Carson," in the bank vault, and demanded payment of the same from the maker. This was refused, and suit was brought.

Little & Spencer, J. B. Foraker, and L. C. Black, for appellant.
Charles Darlington and Robert Ramsey, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Strictly speaking, the only ground which can support the complainant's bill is that the bank and its successors in title to the note sued on in the action at law are estopped by matter in pais to assert Carson's liability on the note. That there was no consideration for the note, and that through the bank's negligence a solvent indorser of collateral notes was released, are both defenses which could have been set up on the law side of the court, and need no interference by a court of equity to make them effective.

No objection was taken to the averments of the bill setting up these defenses, however, and, as a determination of the issues raised on them will throw light on the defense of estoppel, we shall proceed to consider them in their order. And first as to the defense of a want of consideration. If it be true that Carson's loan of $8,000, February 6, 1882, was a loan to the bank, the credit which the bank gave him, of about $8,000, on June 26th, was a mere repayment of that loan; and there could have been no consideration for Carson's note to the bank, given then, or a few days later. If, however, the loan was made to Ankeney & Smart, then there is no explanation of the credit which the bank gave Carson, June 26th, except the discount of his note, and the payment to him of the pro-

ceeds. Our attention, therefore, must first be directed to the transaction of February 6th. Ankeney's evidence is explicit that he borrowed the money from Carson for Smart & Ankeney, and made their note to him for the amount. Carson's evidence is by no means as clear. He does say that he understood that he was lending the money to the bank, but he nowhere states that Ankeney told him this in words. He says that, to him, Ankeney was the bank, and that, when he said "I" or "we" "can use the money," he thought he meant the bank. He concedes, however, that he knew that Smart & Ankeney were engaged in a speculation in coal lands, and that Ankeney said something to him about coal-land securities. While it is true that Ankeney is discredited as a witness by his dishonesty in misusing the credit of the bank, we think that the circumstances of the case so strongly corroborate his statement that Carson's version cannot be credited. Carson's remark to Smart, made shortly after the loan, that they were using his money in their coal investment, is hardly consistent with his claim that his loan was a loan to the bank, unless he thought that Ankeney was pledging the credit of the bank to borrow money for his private investments. If that were his supposition, then he could not hold the bank on the loan, because it was plainly beyond Ankeney's authority as cashier to use the credit of the bank for such a purpose. Smart's statement that the Smart & Ankeney note for $8,000 was always called between them the "Carson note" makes another circumstance confirming Ankeney's story. It is admitted in the bill that Ankeney put this note in Carson's envelope of private papers on February 6th, when the loan was made. Carson had access to this envelope whenever he chose. Why should Ankeney put such a note there at that time, unless it represented a real transaction? Carson's pass book indicates that a check was drawn by him on February 6th for the $8,000. He produces every voucher but that one. If that were payable to the bank, his case would be clear. If it were payable to. Smart & Ankeney, it would correspond with their note, and establish the truth of Ankeney's story. It is significant that in the entry of the charge to Carson is the memorandum "Note," and that this had been used in previous charges to indicate the drawing of a check to make a loan upon a note. Carson cannot complain if his failure to produce this voucher, so important as evidence on this issue, when he does produce all the others for months before and after, weighs against him. The sequel of June 26th fully confirms Ankeney. The evidential weight of the bank and pass-book entries of June 26th, showing that Carson gave his note to the bank on that day, and received a credit of the proceeds of its discount, cannot be shaken by suggestions of Ankeney's criminal purposes. These entries are so mingled with others made by clerks whose honesty is not impugned that they could only have been made when they purport to have been made. Carson says that he gave the note, at Ankeney's request, three days after June 26th, and dated it back just to accommodate the bank. Which is more consistent with probability,—that Ankeney should make false entries of the discount of Carson's note on the faith

that three days later he could induce Carson foolishly to make, and date back three days, a note for $8,000 to the bank, without consideration, or that, when Ankeney made the entries on the bank's daily blotter, he then had Carson's note? There is but one answer. Finally, the most convincing evidence that the note of Carson was not a mere accommodation to the bank is the fact that he renewed it half a dozen times during a period of more than two years. It is not claimed that he thought the bank was using his name to borrow money. What, then, was the nature of the accommodation to the bank? He does not say. His counsel cannot answer, except to suggest that he was a child in Ankeney's hands, and did what was asked. That Carson was slipshod in business is doubtless true, but that he was so simple as to go on renewing a note he did not owe, to a bank which made no use of it, we cannot credit. As stated by the learned judge in the court below, when there is an issue of veracity between the two men, Carson's unsupported statement is entitled to the greater weight; but when we find inherent improbability in Carson's story, and every circumstance supporting Ankeney's, we must believe Ankeney.

We come next to the claim that the bank ought not to recover on the note because it failed to present for payment the coal land mortgage note for $13,000, and to notify the solvent indorser, Samuel W. Smart, of nonpayment, thereby releasing him. Counsel for appellant argues that Samuel W. Smart was a mere trustee, having no interest in the property mortgaged, and receiving no consideration for his indorsement, and that he could not be made liable on the notes. It is not necessary for us to consider this, because we do not think there was any obligation on the bank to present the notes for payment, or to notify the indorser. These mortgage notes were placed by Ankeney in Carson's private envelope in the vault of the bank as collateral to the Smart & Ankeney note for $8,000. Carson denies all knowledge of their existence. It is not averred either in the bill or the answer, nor does Ankeney anywhere say, that Carson pledged the Smart & Ankeney note and its collateral as security for the payment of Carson's note to the bank. The Smart & Ankeney note and its collateral were not in the possession of the bank. They were in Carson's envelope, and constructively in his possession. They were merely a special deposit with the bank, and imposed no obligation on the bank in the matter of collection and protest. It is true that, on several of Carson's renewal notes, Ankeney had scribbled in pencil, "Coll. to this," but, in the absence of any direct evidence that Carson consented to the use of the Smart & Ankeney note and its collateral to secure his own notes to the bank, we cannot find in this indefinite memorandum proof that he did so. It is probable that, had anything been paid on the Smart & Ankeney note, it would have been applied, with Carson's consent, to his note to the bank; but he was not under any contract, so far as the evidence shows, to permit such application. The debts represented by the two notes were so connected in their origin that it was natural for Ankeney to regard them as the same debt which he owed as prin-

cipal, and Carson only as surety. But, in fact and in law, Carson only was liable to the bank on his note, while Smart & Ankeney were liable on their note to him, but not to the bank. Until Carson should agree with the bank that the one could be held by the bank to secure the other, there was no connection between the notes which charged the bank with any duty to Carson of collecting the Smart & Ankeney note or its collateral.

Finally, we come to the question of estoppel. The president and cashier of the bank expressed their opinion to Carson that his note to the bank was without consideration, but declined to return his note to him until the confused affairs of the bank had been adjusted. If the note in fact represented a real indebtedness, such an expression of opinion on the part of the officers of the bank could not prevent the bank from subsequently enforcing collection. The board of directors never authorized any one to release Carson from his note, and if they had there would have been no consideration to support it. The bank did assume possession of the Smart & Ankeney note and its collateral; foreclosing the mortgage on the coal lands, and releasing W. M. Smart from liability on the principal note. But nowhere does it appear that these securities were taken by the bank as a consideration for a release of Carson on his note. These securities belonged to Carson, and the bank's conduct in assuming ownership over them is said to estop it from now maintaining that Carson is liable on his note. That the bank should account to Carson for anything realized by it from his property is clear; but it might be more difficult to show that there was, in law or equity, any such necessary relation between Carson's property in the Smart & Ankeney securities, and his liability on his note to the bank, that the bank's appropriation of the former was inconsistent with the latter, and created the estoppel claimed. Assuming, however, that the bank's acts in respect to the Smart & Ankeney securities were inconsistent with its right to collect the note against Carson, still we are of the opinion that such acts cannot be made the basis of an estoppel, because they were induced solely by the oft-repeated statements of Carson that he had no interest in the securities, and that his own note was wholly without consideration. These statements were made in the absence of Ankeney, and under the shadow of his then recently revealed defalcations and dishonest conduct. Ankeney has now given his evidence. The books of the bank have been critically examined, and we find the fact to be exactly the reverse of that which Carson stated. To allow Carson to rely, as an estoppel, on acts of the bank which he induced by unfounded representations, would be to allow him to take advantage of his own wrong. It is true that the bank officers might have found much in their own books and other circumstances to shake their faith in Carson's denial of his liability, but it does not lie in his mouth to say now that they ought to have known better than to credit his story. If the delay in enforcing this liability against him prevents a restoration of his former position, he cannot complain, for he brought it about.

The appellant and defendant tender to the complainant, in an amended answer, the mortgage notes, and offer to account for whatever rents may have been received from the coal lands by crediting the same with interest on the note. We think that credit should also be given, with interest from the date of its receipt, for the money which Ankeney sent to Carson for credit upon the note, and which Carson declined to receive, but turned over to the bank. The decree of the district court must be reversed, with instructions to enter a decree enjoining the action on the note unless the plaintiff shall make credits upon the note as above.